IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BESS BAIR; TRISHA LEE LOTUS; BRUCE EDWARDS; JEFFREY HEDIN; LOREEN ELIASON; ENVIRONMENTAL PROTECTION INFORMATION CENTER, a non-profit corporation; CENTER FOR BIOLOGICAL DIVERSITY, a non-profit corporation; and CALIFORNIANS FOR ALTERNATIVES TO TOXICS, a non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>CALIFORNIA STATE DEPARTMENT OF TRANSPORTATION, and CINDY McKIM, in her official capacity as Director of the State of California Department of Transportation,<br><br>Defendants. | No. C 10-04360 WHA<br><br>**ORDER GRANTING PRELIMINARY INJUNCTION** |

**INTRODUCTION**

This environmental-impact litigation arises out of a proposal to widen Highway 101 through old-growth redwood trees. A preliminary injunction is warranted until a final decision on the merits, for the reasons below.

**STATEMENT**

Two hundred miles north of San Francisco, at the southern edge of Humboldt County, is Richardson Grove State Park. It is home to ancient redwoods 300 feet tall and thousands of years old. The park shelters an abundance of wildlife, including the marbled murrelet and spotted owl.

1    Highway 101 threads through the park for about one mile. Some huge redwood trees
2 come right up to the road, narrowing the two-lane highway to a mere 22 feet (EA 3). Due to its
3 narrow and winding curves, this section of the highway poses safety hazards for large trucks.
4 Specifically, trucks authorized by the Surface Transportation Assistance Act, 23 U.S.C. 101, are
5 often longer and carry more volume than standard trucks. Most of these longer vehicles are
6 prohibited from using this section of Highway 101 because of "off-tracking." A truck off-tracks
7 when its back tires do not follow its front tires around a curve, but rather take the shorter route.
8 Narrow lanes and tight turns lead to off-tracking. Despite the safety hazard, there are a few
9 legislative exceptions, including a temporary exception for livestock haulers, which allow some
10 STAA trucks access through the park (EA 1–4).

11    Defendants California Department of Transportation and Cindy Kim, the director of
12 Caltrans, have initiated the Richardson Grove Operational Improvement Project to widen the road
13 to meet highway requirements in order to allow all STAA trucks safer passage through the park.
14 The stated purpose of allowing larger trucks through-access on Highway 101 is to lower the cost
15 of transportation for goods imported into and exported from Humboldt County (EA 5). Currently,
16 for instance, STAA trucks going from Oakland to Eureka must take a 446-mile detour via I-5
17 through Oregon and back south on Route 101 (EA 5).

18    This environmental-impact controversy arises because widening the road might have
19 adverse effects on the redwoods. Their roots are shallow. The roots extend outward three to ten
20 times the diameter of the tree trunk (EA 41 n.6; Compl. ¶ 36). Their interlacing root system
21 provides mutual reinforcement (Compl. ¶ 71). The soil is loose and aerated. Redwoods breathe
22 through their roots, absorbing air, nutrients, and water. The trees need non-compact soil to thrive
23 (McBride Decl. ¶¶ 11–14).

24    For these reasons, the proposal is merely to widen the roadway slightly and to do so using
25 minimal-impact techniques. During oral argument, Caltrans' attorney stated that the plan would
26 fell 54 trees. Only six of them are redwoods, two of which are located inside the park and none of
27 which are old growth — meaning those six redwoods have diameters less than 30 inches (EA 40).
28 Once cleared, the project plans to regrade, realign, and widen the road. In most cases, the project

2

1   would shift the center line of the highway by one to six feet.  The maximum realignment would
2   shift the centerline 17 feet (EA 62).  The construction calls for cut-and-fill techniques.  In other
3   words, Caltrans would cut the soil and fill it with sturdy, compact material suitable for highway
4   foundation.  This, however, is a main point of contention.  (This poses a risk for the root system,
5   which needs loose soil, not compact soil.)  To continue with mitigation precautions, excavation
6   near old-growth redwoods would be done by hand or with an air spade.  An air spade uses air
7   compression to clear away dirt rather than cutting roots while digging away at soil.  Roots that are
8   less than two inches would be cut and watered so they would not dry out.  Brow logs would be
9   braced against tree trunks to minimize the effect of fill on the trees (EA 113–15).  A retaining
10  wall to support the roadway would be installed spanning 200 feet and reaching ten to thirteen feet
11  high (EA 19).  New culverts would replace older ones to improve drainage (EA 41).  Clearly, the
12  proposal has been drawn with an eye to mitigating most damage to the redwoods.

13          Caltrans issued a draft and then a final Environmental Assessment.  In its draft EA,
14  Caltrans stated that construction around redwood roots has the "most potential to result in impacts
15  to trees" and that the project would be "likely to [a]dversely [a]ffect" the spotted owl (Draft EA
16  83, 104).  After issuing its draft EA — pursuant to NEPA — and its Section 4(f) analysis —
17  pursuant to the Department of Transportation Act of 1966, 49 U.S.C. 303 — Caltrans received
18  hundreds of letters protesting the project (Duggan Decl. Exh. 3-1 through 3-12).  In response,
19  Caltrans slightly changed its proposal.  In May 2010, Caltrans issued a final EA, which
20  documented relocating a proposed retaining wall, added a chart describing trees whose roots
21  would be affected by the cut and fill soil, more than doubled the estimate of trees whose root
22  structures might be adversely impacted, and cited the names of two arborists who claimed no
23  significant impact would occur (EA 19–20, 108–12).  Despite opposition, the agency adopted a
24  "finding of no significant impact."  The FONSI avoided the requirement of performing a
25  complete investigation and producing an Environmental Impact Statement.

26          Plaintiffs are individual supporters and non-profit environmental groups who claim this
27  project will jeopardize the health of the trees and wildlife.  Plaintiff Bess Bair is the
28  granddaughter of the owner of The Harstook Inn (situated in the Park), which was sold to Save-

3

The-Redwoods League. The granddaughter of the man who originally gave Richardson Grove to California, plaintiff Trish Lee Lotus remains an avid visitor to the Grove. Plaintiff Bruce Edwards is a truck driver from Humboldt County who regularly drives on this section of Highway 101. While performing volunteer work for the Piercy fire department, plaintiff Jeffrey Hedin drives through Richardson Grove. Plaintiff Loreen Eliason owns an inn on Highway 101 just six miles north of Garberville and claims that the preservation of Richardson Grove is essential to her business and those like it (Compl. ¶¶ 20–23). Plaintiffs Environmental Protection Information Center, Center for Biological Diversity, and Californians for Alternatives to Toxics are non-profit organizations that promote environmental protection. These groups and individuals bring this action on behalf of their members who have an interest in California's wildlife and natural wonders (Compl. ¶¶ 24–26). Harm to the redwoods and natural environment of the park would allegedly irreparably hurt the "health, recreational, scientific, cultural, inspirational, educational, [and] aesthetic" interests of the plaintiffs (Compl. ¶ 27).

This action alleges that defendants have violated the National Environmental Protection Act, the Department of Transportation Act, the Wild and Scenic Rivers Act, and the Administrative Procedure Act. The complaint claims defendants violated NEPA by failing to (1) establish the need and purpose for the project, (2) disclose and evaluate the significant environmental effects, (3) explore and evaluate reasonable alternatives to the project, (4) adequately document public comments and concerns and responses to those comments, and (5) prepare an environmental impact statement (Compl. ¶ 99). Plaintiffs also allege that Caltrans violated Section 4(f) of the Department of Transportation Act by failing to determine that no alternatives existed and by failing to create a plan that would minimize harm (Compl. ¶ 120). In not consulting with the National Park Service concerning the effects of relocating the retaining wall closer to the Eel River, defendants allegedly violated Section 7 of the Wild and Scenic Rivers Act (Compl. ¶ 125). The Administrative Procedure Act was violated, it is said, by approving and adopting an EA/FONSI contrary to NEPA and Section 4(f) standards.

4

1  By the instant motion, plaintiffs seek a preliminary injunction to halt all activity on this
2  project while we litigate the merits. At this stage, defendants have not submitted the
3  administrative record, but instead we have the record submitted on this motion.

**ANALYSIS**

A plaintiff seeking a preliminary injunction must show (1) that she is likely to suffer irreparable harm in the absence of a preliminary injunction, (2) that she is likely to succeed on the merits, (3) that the balance of equities tips in her favor, and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, *Inc.*, 129 S.Ct. 365, 374 (2008). So long as a likelihood of irreparable harm is always shown, these elements are balanced on a sliding scale, so that a stronger showing of one may offset a weaker showing of others. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). More specifically, if a likelihood of irreparable harm is shown, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Id*. at 1134–35 (citation omitted).

### 1. LIKELY TO CAUSE IRREPARABLE HARM.

Plaintiffs have the burden to prove that likely irreparable harm will result, absent a preliminary injunction. *Winter*, 129 S.Ct. at 374. A mere possibility of some remote future harm does not merit a preliminary injunction. *Id*. at 375–76. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 545 (1987).

Plaintiffs have demonstrated that irreparable harm is likely. They submit a convincing analysis by Dr. Joe McBride, a professor of forestry and landscape architecture at the University of California, Berkeley. After reviewing the FONSI, the two arborist reports, and performing an on-site tree-by-tree analysis himself, Dr. McBride determined that "substantial, irreparable damage would occur to the trees in the [p]roject area as a result of the proposed project" (McBride Decl. ¶ 44). His analysis detailed the potential damage to the trees if the project were completed. He asserted that (1) soil cut and fill would injure the root systems of 108 trees, 37 of

5

1  which would be greatly harmed or die, (2) new culverts would damage seven ancient redwoods,
2  (3) increased wind velocity from the realignment of the road would cause desiccation (the process
3  of drying out), and (4) the removal of 54 trees would diminish the overall health of the forest
4  (McBride Decl. ¶¶ 18–19 and Exh. 3).  McBride's report considered the extra mitigating
5  measures Caltrans plans to take in order to keep the roots moist and minimize soil compaction.  In
6  spite of these measures, he found that the adverse effects are likely to happen.

7  Defendants argue that the McBride report did not declare "likely" harm, but rather
8  repeatedly declared "increase[d] potential for tree failure" (McBride Decl. Exh. 3).  In doing so,
9  defendants take these phrases out of context.  McBride clearly opined that trees would be
10 "severely impacted" and soil cutting and filling would lead to the "demise" of many trees
11 (McBride Decl. ¶ 39).  Indeed, McBride clarified that 37 trees — 8 of which are old-growth
12 redwoods — "would be severely impacted," and those severe impacts would "likely include . . .
13 deaths [of trees]" (McBride Supp. Decl. ¶¶ 11–13).  Plaintiffs have provided sufficient
14 information that harm is likely.

15 The type of harm Caltrans' project threatens is undoubtedly irreparable.  Exposing and
16 cutting the roots of these trees makes them prone to infection and drying out.  Weakening the
17 roots of redwoods adjacent to the road affects the complex symbiotic root structure of the entire
18 grove.  After we decide the merits, Caltrans cannot plant new redwoods to provide adequate
19 relief.  Some of the trees that are likely to be harmed are more than a thousand years old.

20 Defendants are correct that NEPA does not demand any specific environmental outcome.
21 The requirement of an EIS is procedural, but the mandatory in-depth analysis forces agencies to
22 take a hard look and truly consider the impact of their plans.  Once that is done, then the agency
23 can, as far as NEPA is concerned, opt for a plan despite its adverse environmental consequences.
24 Nonetheless, at the preliminary injunction stage, plaintiffs must demonstrate irreparable injury
25 and, in this case, they have done so.

26 **2. SERIOUS QUESTIONS GOING TO THE MERITS.**

27 The issue is whether a full EIS was needed versus a mere EA.  NEPA requires agencies to
28 prepare an EIS for "[f]ederal actions significantly affecting the quality of the human

6

environment." 42 U.S.C. 4332(2)(C). To determine whether there are significant impacts, an agency first takes a "hard look" at the potential environmental consequences and create an EA. If the EA finds that the environment may be significantly impacted, the agency must then issue an EIS; if no significant impact is found, the agency can declare a "finding of no significant impact," and proceed with the project. A FONSI must show a "convincing statement of reasons" as to why there is no significant impact. *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 864 (9th Cir. 2005) (citation omitted).

Plaintiffs' strongest argument on the merits is that Caltrans violated NEPA by (1) not adequately evaluating the potential environmental impact, and as a result, (2) not completing an EIS. In allegedly miscategorizing the project as having "no significant" effect, Caltrans ended its environmental review with a mere EA instead of creating a full EIS analysis. Without dispute, NEPA applies to Caltrans, a state agency, because the Federal Highway Administration allegedly approved and is partly funding the specific project (Compl. ¶ 29).

### A. Convincing Statement of Reasons?

An agency "cannot avoid preparing an EIS by making conclusory assertions that an activity will have only an insignificant impact on the environment." *Ocean Advocates*, 402 F.3d at 864. If the reasons for a FONSI are arbitrary and capricious and the complete administrative record demonstrates that the project may have significant impact on the environment, ordering the preparation of an EIS is appropriate. *Center for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1179 (9th Cir. 2008). An EA is arbitrary and capricious if it "entirely fail[s] to consider an important aspect of the problem, or offer[s] an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (quotation marks and citations omitted), *overruled on other grounds by Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). Yet, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Bear Lake Watch, Inc. v. Fed. Energy Regulatory Comm'n*, 324 F.3d

7

1071, 1076–77 (9th Cir. 2003) (citation omitted).  Although courts defer to agency expertise on questions of methodology, they do not ignore an agency's failure to address factors pertinent to an informed decision.  *Id*. at 1077.

Plaintiffs have raised serious questions concerning whether Caltrans' statement of reasons was arbitrary and capricious.  For example, in its final EA, Caltrans issued a FONSI — a finding of no significant impact.  There is too much evidence, however, that the impact would be significant.  In its draft EA, Caltrans cited the Department of Parks and Recreation, stating "construction activities [around the structural root zone] have the most potential for injury" (Draft EA 83).  In fact, the California Department of Parks and Recreation's handbook states that "*any* intrusion into this zone is usually accompanied by *significant* injury . . . [which will] shorten the useful life of the tree" (Duggan Decl. Exh. 5) (emphasis added).  So, because Caltrans proposed construction activities within the root zones of redwoods, there is reason to believe that there would be significant injury.

Furthermore, the proposal acknowledged that hard, compact fill disrupts water absorption and respiration.  Yet, the plan called for hard fill in the structural root zones of 41 old-growth redwood trees with a diameter of at least 30 inches (EA 107–08).  The EA stated that this construction, which would compact soil, would occur within the root zones of about 74 redwoods (EA 107).  In spite of the evidence to the contrary, Caltrans tersely summarized statements from Arborists Darin Sullivan and Dennis Yniguez to conclude that old-growth redwoods would not be substantially affected (EA 110).

Plaintiffs provide notes from a meeting where Arborist Yniguez declared that he was *not* a redwood expert.  Concerned about water moisture, he recommended defendants contact someone like Dr. Steve Sillett who would best be able to measure moisture content in the soil (Reply Exh. 1).  (Dr. Sillett is a professor and chair of redwood forest ecology in the department of forestry and wildland resources at Humboldt State University.)  In another meeting in April 2008, defendants noted that "[with] regard to tree impacts Dr. Sillett could refute our conclusion and he is expert opinion [sic]" (Reply Exh. 2).  Indeed, Dr. Sillett sent a letter to the Department of

8

Transportation that very month exclaiming that "cutting large roots is a BAD IDEA if maintaining tree health and vigor is a goal" (Reply Exh. 3).[1]  When an agency does not acknowledge contrary relevant evidence that its own experts find, its analysis is arbitrary and capricious. *Inst. for Wildlife Prot. v. Norton*, 174 F. App'x 363, 366–67 (9th Cir. 2006). Defendants used Arborists Sullivan and Yniguez's conclusion that the project would cause no substantial harm, but they neglected to acknowledge the doubt expressed by Arborist Yniguez.

In addition, plaintiffs show inconsistencies in the EA's data analysis that might be found "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Lands Council*, 537 F.3d at 987.  Not only did the EA allegedly not map all the trees where the construction would occur — including a redwood with a 91-inch diameter — but it miscalculated the diameters of "several trees" on the map (McBride Decl. ¶¶ 21, 26).  For example, the EA reported that the diameter of tree 17 was 84 inches; plaintiffs' redwood expert measured the diameter to be 103 inches (McBride Decl. ¶ 26).  Caltrans' algorithm for determining the location of a redwood's structural root zone is three times its diameter.  So, in order to fully understand the potential damage to the structural root zone of a redwood and the whole grove, all the trees in the construction area must be identified and their diameters must be measured correctly.  Such discrepancies are not merely differences in methodology for which deference would be given to agency experts.  They are examples raising serious questions about whether defendants truly took a "hard look" at the effects of the project.

### B.        "Significant" Environmental Impact?

In order to require an agency's production of an EIS, "plaintiff need not show that significant effects will in fact occur," but rather that there are "substantial questions whether [the] project may have a significant effect." *Ocean Advocates*, 402 F.3d at 864–65 (citations omitted).

---

[1] During oral argument, defense counsel stated that someone at the agency spoke to Dr. Sillett by phone after the agency made its final conclusions and Sillett agreed with the agency.  Yet, there is no evidence in the record on this point — no declaration from Dr. Sillett or the person at the agency who assertedly spoke with him — to support that statement. This order cannot credit the unsworn argument of counsel as opposed to the written record timely submitted by the parties.

9

Significance is statutorily defined by context and intensity. 40 C.F.R. 1508.27. To evaluate context, an agency must address the long- and short-term interests of the locality and society as a whole. To evaluate intensity, an agency must look at the severity of the impact. Section 1508.27 sets forth ten factors defining intensity. In some circumstances, the presence of just one factor necessitates an EIS. *Ocean Advocates*, 402 F.3d at 865. The following analysis demonstrates the likely satisfaction of many of these factors.

1. *Impact, Both Beneficial and Adverse*: Caltrans' project may benefit the economy of northwest California in the long-run by providing easier, safer, and cheaper access to transportation. It also poses a risk of irreparable harm to the interlaced root system of the trees and other species living in the grove.

2. *Unique Geographic Area*: Richardson Grove State Park is a decidedly unique geographic area. Coastal old-growth redwood trees are scarce and the grove is designated as a park because of its unique features.

3. *Highly Controversial Effects on Human Environment*: A project is highly controversial if there is "a substantial dispute about the size, nature, or effect of [a] major [f]ederal action."[2] *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005) (citations and original brackets omitted). Caltrans' draft EA inspired over 800 responsive letters protesting the widening of Highway 101 and questioning the true effects on the grove. Caltrans' arborists disagree with plaintiffs' experts over the effects of the proposal on the environment. Arborists Sullivan and Yniguez stated that the project, which includes the cutting of roots two inches or less, would have no significant effect on the grove. Plaintiffs' redwood expert, Dr. McBride, declared that this project will result in "tree failure" (McBride Decl. Exh. 3). Dr. Sillett, also a redwood expert, agreed. He stated that cutting woody redwood roots "leads to decline" (Reply Exh. 3). At one eighth inch, roots become woody (McBride Supp. Decl. ¶ 8).

---

[2] Defendants do not contest that the Richardson Grove project is a major federal action.

So, the mitigation effort to only cut roots less than two inches may not be sufficient to prevent harm. This scientific controversy is in addition to public opposition.

4. *Uncertainty of Effects*: In the leading decision on preliminary injunctions in the NEPA context, the Supreme Court paid particular attention to known effects versus unknown effects. There, the procedure at issue had been around for 40 years and its effects were understood. *Winter*, 129 S.Ct. at 376. Here, Caltrans relied on the ability to mitigate harm with allegedly untested and unproven procedures. For instance, Caltrans states that the use of brow logs against tree trunks would minimize the effect of fill on the trees. Plaintiffs respond that this is a new, experimental technique, and that defendants have provided no data showing the efficacy of this mitigation idea.

5. *Impact on Endangered Species*: Some federally-protected endangered species live in Richardson Grove, including the spotted owl and marbled murrelet. The EA even stated that "due to the sensitivity of the species, it has been determined that the light, noise, and activity of proposed construction "[m]ay [a]ffect, and is likely to [a]dversely [a]ffect" northern spotted owls (EA 137). In its biological opinion, U.S. Fish and Wildlife Service also stated that construction "may result in harassment of marbled murrelet that nest within 825 feet of the projected area" (EA 135). As "there is not much known about the population numbers for marbled murrelet in this area," the extent of the severity to the population cannot be determined (*ibid*.). With such uncertain consequences to endangered species, there may be substantial questions as to whether this project requires an EIS.

\*          \*          \*

This order finds that plaintiffs have raised serious NEPA questions on the merits.

**3.     BALANCING THE EQUITIES.**

Our court of appeals requires a balancing test, one that weighs the competing claims of injury by considering "the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co.*, 480 U.S. at 542. As reviewed above, when the plaintiff has presented serious questions going to the merits, the scale must tip *sharply* in the plaintiff's favor. *Alliance*

11

*for the Wild Rockies*, 632 F.3d at 1134–35.  In other words, the environmental risk were the preliminary injunction not granted must be weighed against the economic loss or other risk were the injunction granted, and the scale must tip sharply on the side of environmental risk.

Defendants claim that moving forward with this project will not harm plaintiffs at all. Physical construction will not start until the end of January 2012, after the merits of our action have already been decided.  The physical construction, however, is not the only impetus for irreparable harm.  Allowing Caltrans to proceed with advertising and securing bids would constrain its ability to choose an alternative plan at a later date.  Bids should be based on the plan that will be implemented, which might be wholly different from the current one proposed.  This would lead to a change in orders and further expense.  Defendants assert that a delay in the bid process would postpone the start of construction, parts of which can only take place during specific times of the year (Fielder Decl. ¶¶ 3–4).  In other words, if defendants win this suit, an interim preliminary injunction would delay the project (that could then lawfully proceed) by one year.  A year delay would increase costs by $165,000 and thereby "introduce uncertainty and risk regarding [p]roject schedule and project completion" (Fielder Decl. ¶¶ 5–6).  Although this economic hardship is a serious concern, in balancing the equities, the scale tips sharply to the safety of our 3,000 year-old redwood trees.  Given that, the Court will set a case schedule calculated to expedite a final decision and to minimize the economic hardship in the interim.

**4.    THE PUBLIC INTEREST.**

For the same reason, the public interest favors a short reprieve until the merits can be sorted out.  This is not a case in which the public interest is pitted against a private interest.  This is a case in which the public has an interest on both sides of the scale.  The public interest is best served by letting the ancients thrive a little longer while the merits of their future are evaluated in court.

**5.    SCOPE OF INJUNCTION.**

"Injunctive relief . . . must be tailored to remedy the specific harm alleged[;] an overbroad injunction is an abuse of discretion."  *Stormans Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir.

12

2009) (quotation marks, citations, and original brackets omitted). Nonetheless, an injunction is not overbroad if its scope aims to remedy actual harm. *See Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1161 (9th Cir. 2011).

Here, plaintiffs move for an injunction halting "any and all" activities related to the project. This would include securing funding, advertising, and soliciting and awarding contracts (Opp. 14). Plaintiffs fear that these preliminary activities will commit Caltrans to a certain course of action and foreclose the possibility of alternative options (Reply 7–8). As our court of appeals has explained, once highway planning reaches the final stages of approval,

> there is likely to be an irreversible and irretrievable commitment of resources, which will inevitably restrict the [highway officials'] options. Either the [highway planners] will have to undergo a major expense in making alterations in a completed [plan] or the environmental harm will have to be tolerated. It is all too probable that the latter result would come to pass.

*Lathan v. Volpe*, 455 F.2d 1111, 1121 (9th Cir. 1971) (quotation marks and citation omitted) (holding that enjoining agency from acquiring property for highway-construction project until agency created EIS was not overbroad preliminary injunction), *overruled on other grounds by Lathan v. Brinegar*, 506 F.2d 677, 691 (9th Cir. 1974).

All construction, awards for construction, and formal solicitation or advertising for contracts for construction are now enjoined pending final decision herein. However, scoping of possible future contracts and exploration of possible ways to develop the plan and to mitigate damage all may go forward.

### 6. BOND/DEPOSIT.

Rule 65(c) generally requires a movant to deposit a security. Courts, however, have "discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review." *Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1190–91 (N.D. Cal. 2009) (Alsup, J.) (citation omitted) (requiring no bond). Here, plaintiffs are five individuals and three environmental groups. In order to not deny these plaintiffs access to judicial review, a bond of $10,000 must be posted within 14 calendar days of the date of this order.

**CONCLUSION**

For all the reasons discussed above, a preliminary injunction is **GRANTED**.

As discussed at the motion hearing, an expedited schedule on the merits is warranted. All prior dates set in this matter are vacated. Defense counsel stated at the hearing that the administrative record would be ready within a day of the hearing, but one has not yet been filed. Defendants shall file the administrative record by **JULY 11, 2011**. Plaintiffs shall file their motion for summary judgment limited to 30 pages by **SEPTEMBER 8, 2011**. Defendants shall file their opposition to plaintiffs' motion and cross-motion for summary judgment limited to 30 pages by **SEPTEMBER 29, 2011**. Plaintiffs shall file their opposition to defendants' cross-motion and their reply in support of their motion for summary judgment limited to 15 pages by **OCTOBER 20, 2011**. Defendants shall file their reply brief in support of their cross-motion limited to 15 pages on **NOVEMBER 3, 2011**. The hearing shall be on **DECEMBER 1, 2011, AT 8:00 A.M.**

**IT IS SO ORDERED.**

Dated: July 6, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE