United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BESS BAIR; TRISHA LEE LOTUS; BRUCE EDWARDS; JEFFREY HEDIN; LOREEN ELIASON; ENVIRONMENTAL PROTECTION INFORMATION CENTER, a non-profit corporation; CENTER FOR BIOLOGICAL DIVERSITY, a non-profit corporation; and CALIFORNIANS FOR ALTERNATIVES TO TOXICS, a non-profit corporation,

    Plaintiffs,

  v.

CALIFORNIA STATE DEPARTMENT OF TRANSPORTATION, and CINDY McKIM, in her official capacity as Director of the State of California Department of Transportation,

    Defendants.

                                      /

No. C 10-04360 WHA

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT, MOTION TO STRIKE, AND MOTION FOR SANCTIONS**

**INTRODUCTION**

In this NEPA action, the parties bring cross-motions for summary judgment. Plaintiffs also move to strike defendants' opposition to plaintiffs' motion for summary judgment, or in the alternative, the declarations of defendants' witnesses filed in support of defendants' motion, and move for sanctions. This order follows full briefing and oral argument, as well as a visit to the site in question by Magistrate Judge Nandor Vadas and representatives of both parties, and supplemental briefing. For the reasons set forth below, plaintiffs' motion is

**GRANTED IN PART**, and the matter is **REMANDED** for the purpose of preparing a revised environmental assessment on a corrected record.

## STATEMENT

This environmental-impact litigation arises out of a proposal to widen Highway 101 through Richardson Grove State Park. The park is home to ancient redwoods 300 feet tall and thousands of years old, and the park shelters an abundance of wildlife, including the marbled murrelet and spotted owl (AR 123, 303-09).

Highway 101 threads through the park for about one mile (AR 11). The existing roadway through the park, originally constructed around 1915, is a narrow, two-lane highway (AR 18). Some huge redwood trees, including redwoods up to 16 feet in diameter, come right up to the road, narrowing the two-lane highway to a mere 22 feet (*ibid*.). Due to its narrow and winding curves, this section of the highway poses safety hazards for large trucks (AR 19). Specifically, trucks authorized by the Surface Transportation Assistance Act, 23 U.S.C. 101, are often longer and carry more volume than standard trucks (AR 20-21). Most of these longer vehicles are prohibited from using this section of Highway 101 because of "off-tracking" (AR 19, 21). A truck off-tracks when its back tires do not follow its front tires around a curve, but rather take the shorter route (AR 19). Narrow lanes and tight curves lead to off-tracking (*ibid*.). Off-tracking may cause unintended consequences, such as collisions of the trucks with trees or signs, or encroachment into the opposing lane of traffic (*ibid*.). There are a few legislative exceptions, however, including a temporary exception for livestock haulers, which allow some STAA trucks access through the park (AR 18).

Defendants California Department of Transportation and Cindy Kim, the director of Caltrans (collectively "Caltrans"), initiated the Richardson Grove Operational Improvement Project to widen the road to meet highway requirements in order to allow all STAA trucks passage through the park. The stated purpose of allowing larger trucks through-access on Highway 101 is to lower the cost of transportation for goods imported into and exported from Humboldt County (AR 19-25). Currently, for instance, STAA trucks going from Oakland to

Eureka must take a 446-mile detour via I-5 through Oregon and back south on Route 101 (AR 22). Local businesses and residents pay 10-15 percent more for goods due to poorer truck access (AR 22). The proposed project comprises three segments of work: (i) realigning the roadway by two to six feet on average along a half mile stretch; (ii) replacing culverts in five locations and building a 200-foot retaining wall 10-13 feet below the road; and (iii) paving the existing highway (JS ¶ 9; AR 35-36). The present controversy arises because widening the road involves excavation activities that impact old-growth redwoods. Caltrans defines old-growth redwoods as those with a diameter of 30 inches or greater (AR 18).

Caltrans issued a notice of preparation for an environmental assessment in May 2008 (JS ¶ 18). Caltrans then released a draft EA in December 2008 (JS ¶ 19). In its draft EA, Caltrans determined that the project would result in the removal of 87 trees, and that 40 trees would be subject to cut-and-fill techniques (JS ¶ 13; AR 124). Cut-and-fill techniques involve "cutting" the soil around the roots of trees and filling it with sturdy, compact material suitable for highway foundation (AR 127). The use of these techniques, however, is a main point of contention because cutting and filling pose risks to the structural root systems of the trees (*ibid.*). After issuing its draft EA — pursuant to NEPA — and its Section 4(f) analysis — pursuant to the Department of Transportation Act of 1966, 49 U.S.C. 303 — Caltrans opened the draft EA to public comment, and received nearly 800 hundred letters and emails, some in support of and some in opposition to the project (AR 359). In response, Caltrans changed its proposal. In May 2010, Caltrans issued a final EA, which documented relocating a proposed retaining wall; added a chart identifying trees whose roots would be affected by the cut and fill of soil; more than doubled the estimate of trees whose root structures might be adversely impacted; and cited the names of two arborists who claimed no significant impact would occur (JS ¶ 13-15, 21; AR 35-26, 127-32). Despite requests for further opportunity for public comment, Caltrans approved the final EA, which adopted a "finding of no significant impact" (AR 7670-71, 7696-97; JS ¶ 21), the legal effect of which was to avoid having to prepare an environmental impact statement.

The final EA identifies that the project will fell 54 trees (AR 124). According to the final EA, only six of them are redwoods of four to 19 inches in diameter, two of which are located inside the park and none of which are old-growth (AR 124, 126). The final EA identifies two small redwoods of six to seven inches in diameter within the park that will be removed (AR 124). The final EA also identifies 68 redwoods with diameters of 30 inches or greater that will be impacted by cut and fill techniques (JS ¶ 15). The project calls for cut-and-fill activities within the structural root zones of these 68 trees, with excavation at depths of approximately two feet and maximum fill depths of three and a half feet (AR 60). The excavation will involve cutting the roots of old-growth redwoods, including roots within the structural root zones of the redwoods (AR 126-27, 394-95), but not roots two inches or larger in diameter (AR 1124). To lessen the impact to old-growth redwoods, the project identifies mitigation precautions. For example, excavation near old-growth redwoods would be done by hand or with an air spade. An air spade uses air compression to clear away dirt rather than cutting roots while digging away at soil. Roots that are less than two inches would be cut and watered so they would not dry out. Brow logs would be braced against tree trunks to minimize the effect of fill on the trees (AR 132-34).

Plaintiffs are individual supporters and non-profit environmental groups who claim this project will jeopardize the health of the trees and wildlife. These groups and individuals bring this action on behalf of their members who have an interest in California's wildlife and natural wonders (Compl. ¶¶ 24–26).

*       *       *

This action was filed in September 2010, challenging the finding of no significant impact and use of an EA rather than an EIS. The complaint alleges that Caltrans violated the National Environmental Protection Act, the Department of Transportation Act, the Wild and Scenic Rivers Act, and the Administrative Procedure Act. Plaintiffs previously sought injunctive relief to halt all activity on the project while the parties litigated the merits. A preliminary injunction was granted in July 2011 (Dkt. No. 84).

4

The administrative record was lodged in July 2011 (Dkt. No. 85). It contains over ten thousand pages. After the administrative record was lodged, the parties requested additional time to file their respective motions for summary judgment (Dkt. No. 100). The parties' stipulation provided plaintiffs until December 5, 2011, to file their initial motion (*ibid.*). The parties engaged in two unsuccessful settlement conferences in August 2011 and October 2011, and in December 2011, the parties' filed their respective cross-motions for summary judgment. Plaintiffs also filed a motion to strike and a motion for sanctions. The motions were not fully briefed until January 2012.

A hearing on the parties' cross-motions was held on February 23, 2012. During oral argument, it became apparent that one of plaintiffs' primary challenges was Caltrans' reliance on a series of maps that had served as the basis for its analysis of the proposed project. These maps had been provided to the public for review and comment, and counsel for Caltrans stated at the hearing that the maps embodied a tree-by-tree analysis of the project's proposed impact on old-growth redwoods. Plaintiffs' counsel argued, however, that the maps had omitted altogether old-growth redwoods very close to the proposed project, and that at least one of the old-growth redwoods shown on the maps was much wider than depicted. Specifically, plaintiffs' counsel identified one tree in the EA, assigned number 17 by plaintiffs, reported by the map to have a diameter of 84 inches, which plaintiffs' contended actually was 103 inches in diameter. Following the hearing, Magistrate Judge Nandor Vadas, whose chambers were close by, was good enough to conduct a site visit with representatives of both parties in order to measure six trees: five trees of plaintiffs' choice, in addition to the tree alleged by plaintiffs to have a 103-inch diameter (Dkt. No. 118). This was to address plaintiffs' contention that the Caltrans' maps did not contain all relevant data, and that extra-record evidence was therefore necessary. *See Public Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982) (citing *Asarco, Inc. v. U. S. E. P. A.*, 616 F.2d 1153, 1160 (9th Cir. 1980) (reviewing court should go outside administrative record to consider evidence relevant to the substantive merits of the agency action "for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds for decision")). The reference order asked

5

Judge Vadas to respond to three narrow questions, and plaintiffs' tree selections were limited to trees that plaintiffs' expert, Dr. Joe R. McBride, had already identified in his declaration, submitted in support of plaintiffs' motion (Dkt. No. 66).

After the site visit, Judge Vadas issued a report and recommendation and a supplemental report and recommendation (Dkt. Nos. 137, 144). The report and recommendation contained the measurements of each of the trees selected by plaintiffs, as well as findings concerning whether each tree is contained on the Caltrans' maps, and if so, where. The supplemental report and recommendation contained findings concerning "tiny numerals" that are located on the maps adjacent to the trees depicted on the maps, and what those numerals purportedly refer to. Judge Vadas also answered the three questions contained in the reference order. *First*, Judge Vadas found that tree number 17, which the EA stated had a diameter of 84 inches, is actually 104 inches in diameter. *Second*, Judge Vadas found that the fifth tree measured, assigned number 92, which was measured at 48.8 inches, was omitted altogether from the Caltrans maps. *Third*, Judge Vadas found that of the trees measured, the only tree the parties agreed was omitted from the Caltrans maps was tree number 92, but that the parties disputed the location of the fourth and sixth trees that were measured, tree numbers 81 and 10, respectively. *Fourth*, Judge Vadas found that the "tiny numerals" on the Caltrans maps that are adjacent to the particular trees depicted on the maps represent Caltrans' measurements of the diameters of the trees next to which the numerals appear.

Both parties were provided with the opportunity to file objections to the report and recommendation, as well as supplemental briefing regarding the impact of the site visit findings on the cross-motions for summary judgment. Plaintiffs and Caltrans filed objections to the report and recommendation (Dkt. Nos. 139, 142). Plaintiffs also filed objections to the supplemental report and recommendation (Dkt. No. 145). Having reviewed both reports, as well as the parties' objections to the reports, the reports are adopted and the parties objections are **OVERRULED**.

6

## ANALYSIS

NEPA has no specific judicial review provision. NEPA actions are, instead, reviewable under the APA. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882–83 (1990). The APA limits the scope of judicial review of agency actions. Under the APA, a reviewing court shall set aside agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. 706(2). In its review of an agency decision, a court must be "highly deferential" to the agency; its review must be "narrow," and it "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989); *Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1980).

The reviewing court's role is not to pass judgment on the merits of the material. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The reviewing court's only role is to review the EA to ensure that the agency gave the "required hard look" at the environmental consequences of its decisions. *Kettle Range Conservation Group v. U.S. Forest Serv.*, 147 F.3d 1155, 1157 (9th Cir. 1998). The reviewing court should not "flyspeck" the agency's decision to hold it insufficient based on "inconsequential, technical deficiencies." *Friends of the Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998) (quoting *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996)). But the reviewing court must conduct a "searching and careful" inquiry into the facts. *Marsh*, 490 U.S. at 378.

**1. CLAIM FOR FAILURE TO PREPARE AN EIS (NEPA AND APA).**

NEPA requires that an EIS is prepared for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Not every project necessitates an EIS. Where an EIS is not categorically required, the agency must prepare an EA to determine whether or not the environmental impact is significant enough to warrant an EIS. 40 C.F.R. §§ 1501.3, 1508.9; *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000). If the proposed project will significantly affect the environment, an EIS must be prepared, while if the

7

project will have only an insignificant effect, the agency can declare a "finding of no significant impact," and proceed with the project. 40 C.F.R. §§ 1501.3, 1501.4.

NEPA establishes procedural mechanisms to compel agencies to seriously weigh the potential environmental consequences of a proposed action. Our court of appeals has termed this crucial evaluation a "hard look." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002). Once the agency does the required hard look, it is free to choose to proceed with action that will have an adverse impact on the environment, at least insofar as NEPA is concerned, the idea being that if we are going to destroy the environment, we should do so with out eyes wide open and not by accident.

An EA is arbitrary and capricious if it "entirely fail[s] to consider an important aspect of the problem, or offer[s] an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (quotation marks and citations omitted), *overruled on other grounds by Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). Although courts defer to agency expertise on questions of methodology, they do not ignore an agency's failure to address factors pertinent to an informed decision. *Bear Lake Watch, Inc. v. Fed. Energy Regulatory Comm'n*, 324 F.3d 1071, 1076–77 (9th Cir. 2003).

Here, there are a number of discrepancies and omissions that raise serious questions about whether Caltrans truly took a "hard look" at the effects of the project and made an informed decision. It is to these discrepancies and omissions that this order now turns.

*First*, the EA miscalculates the diameter of at least one old-growth redwood tree. The EA reports that the diameter of one impacted old-growth redwood (assigned number 17 by plaintiffs, and located on sheet number eight of Caltrans' maps), is 84 inches. Yet plaintiffs' redwood expert, Dr. Joe R. McBride, measured the diameter to be 103 inches (McBride Decl. ¶ 26), and the joint measurement of this tree during the site visit revealed that the diameter of this tree is actually 104 inches. Thus, irrespective of whether this tree is contained in the current

EA's Tables 9 and 10, the analysis of the project's impacts in relation to this tree, and hence the grove as a whole, are based off of false data.

*Second*, the EA omitted altogether at least one close-by old-growth redwood tree from its maps and analysis. Tree number 92, as assigned by plaintiffs, was measured during the site visit to have a diameter of 48.8 inches, classifying it under Caltrans' invoked definition as an old-growth redwood. Yet this 48.8-inch tree appears no where on the Caltrans' maps or in Tables 8-10 of the final EA. This tree is 14.6 feet (175.2 inches) from the existing pavement.

Caltrans' algorithm for determining the location of a redwood's structural root zone is three times its diameter (AR 60). And, Caltrans' algorithm for determining the location of a redwood's health root zone is five times its diameter (AR 2555). So, in order to fully understand the potential damage to the structural and health root zones of a redwood and the whole grove, all the trees in the construction area must be identified and their diameters must be measured correctly. This was not done.

Behind the potential impact of these data inaccuracies on the structural and health root zones of the trees hides another problem: the potential impact of cutting "woody" roots. In the draft EA, serious concerns were raised about the impact of cutting "woody" roots of old-growth redwoods because severing these roots can significantly disturb the vigor of the trees. Caltrans responded by stating that it did not intend to cut any roots larger than two inches (AR 384-85, 1124). Importantly, however, Caltrans ultimately admitted in response to public comments that the project may result in cutting roots larger than two inches because it was not possible to determine exactly where roots may be encountered (AR 395). This uncertainty is now exacerbated by the errors in the maps.

Theses discrepancies are not, as Caltrans contends, merely differences in methodology for which deference is owed. Rather, the errors in the data are "so implausible that [they] could not be ascribed to a difference in view or the product of agency expertise." *Lands Council*, 537 F.3d at 987. They are examples raising serious questions about whether Caltrans truly took a "hard look" at the effects of the project. Although perhaps the failure of data or analysis on a single tree might not demonstrate findings that are "highly uncertain," the accumulation of data

9

1    errors certainly raises "substantial questions" about the possible significance of the project's

2    impact on the environment. This shows that Caltrans' fact finding was arbitrary and capricious,

3    and that a more developed record is necessary. *See, e.g.*, *Van Abbema v. Fornell*, 807 F.2d 633,

4    639 (7th Cir. 1986); *Wildlands v. U.S. Forest Serv.*, 791 F. Supp. 2d 979, 992 (D. Or. 2011);

5    *Anglers of the Au Sable v. U.S. Forest Serv.*, 565 F. Supp. 2d 812, 830-831 ( E.D. Mich. 2008).

6        Caltrans is correct that NEPA does not demand any specific environmental outcome.

7    The requirement of an EIS is procedural, but the mandatory in-depth analysis forces agencies to

8    truly consider the impact of their plans. The import of this order is that Caltrans will do just that.

9    Once done, then the agency can, as far as NEPA is concerned, put the trees at risk. If we are

10   going to endanger these ancients, we should do so based on reasonably accurate maps and data.

11       "When there is a need to supplement the record to explain agency action, the preferred

12   procedure is to remand to the agency for its amplification." *Johnson*, 674 F.2d at 794.

13   The errors in the maps frustrate effective judicial review of the agency's actions, and additional

14   explanations of the reasons for the agency's decision is in therefore in order. *Ibid.*; *see also*

15   *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 238-39 (5th Cir. 2007) ("If the court finds

16   that a project may have a significant impact, the court should order the agency to prepare an EIS.

17   If the court finds, on the other hand, that the EA is inadequate in a manner that precludes making

18   the determination whether the project may have a significant impact, the court should remand the

19   case to the agency to correct the deficiencies in its analysis.") (citations omitted). Thus, a

20   revised EA that corrects the data inaccuracies identified above and assesses the impacts of the

21   project through the lens of a corrected analysis is necessary, even if this reevaluation ultimately

22   reveals that the EA/FONSI remains valid. Alternatively, Caltrans may proceed directly to

23   conducting an EIS. In its revised EA (or EIS), Caltrans should give serious consideration to the

24   other significant arguments made by plaintiffs in their motion. On remand, Caltrans is

25   **ORDERED** to prepare accurate maps, and a qualified engineer shall sign and date the

26   revised maps (unlike the unsigned maps in the existing record). The agency's analysis shall

27   number each ancient redwood, clearly identify it in the map, identify its root zone, and set forth

28

the environmental issues to each one. The written analysis and the maps should be readable together without doubt as to which tree is which.

### 2. EXTRA-RECORD EVIDENCE & MOTION TO STRIKE

Both parties challenge the factual record. Caltrans contends that plaintiffs' arguments are based "almost exclusively" on the opinions expressed in the McBride declaration, which is extra-record evidence that should not be considered (Def. Opp. 9). Likewise, plaintiffs move to strike Caltrans' opposition to plaintiffs' motion for summary judgment and Caltrans' entire motion for summary judgment, or in the alternative, to strike the declarations of witnesses Stephen Sillett and Dennis Yniguez, and any references to those declarations, contending that Caltrans disobeyed a court order issued May 3, 2011, which prohibits Caltrans from using any witness to supply evidence on a motion as a result of Caltrans' failure to comply with Rule 26's initial disclosure requirements (Dkt. No. 26). Alternatively, plaintiffs seek to strike the declarations as extra-record evidence.

Our court of appeals allows a reviewing court to consider extra-record materials in an APA case under four exceptions: (1) when it needs to determine whether the agency has considered all relevant factors and has explained its decision; (2) when the agency has relied upon documents or materials not included in the record; (3) when it is necessary to explain technical terms or complex matters; and (4) when a plaintiff makes a showing of agency bad faith. *Southwest Center for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996). For extra-record material to be considered, a showing must fist be made that the record is inadequate. *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1437 (9th Cir. 1988) ("The [plaintiff] makes no showing that the district court needed to go outside the administrative record to determine whether the [agency] ignored information").

Each of the challenged declarations contain post-hoc examinations of the administrative record and are, in that respect, improper. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. Cal. 2007) ("Post-hoc examination of data to support a pre-determined conclusion is not permissible"); *Southwest Ctr. for Biological Diversity*, 100 F.3d at 1450 (striking letter submitted by Forest Service not contained in administrative record as "post-decision

11

1 information"). Nevertheless, portions of each declaration provide facts relevant to determine
2 whether Caltrans considered all relevant factors in its final EA, and will be considered
3 exclusively for this purpose. Caltrans' objections to the McBride declaration are therefore
4 **OVERRULED**, and plaintiffs' motion to strike is **DENIED**.

   **3. MOTION FOR SANCTIONS**

6 Plaintiffs move for sanctions in the amount of $5,700 based on Caltrans' disregard for
7 the May 3 order (Pl. Br. 9). Plaintiffs argue that Rule 37(b)(2) is the source of the court's
8 sanctioning authority. Not so. Rule 37(b)(2) requires a violation of a discovery order to trigger
9 the ability to sanction; it expressly states that a court may sanction a party if it "fails to obey an
10 order to provide or permit discovery." *See Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg.*
11 *Co.*, 982 F.2d 363, 368 (9th Cir. 1992) ("Rule 37(b)(2)'s requirement that there be some form of
12 court order that has been disobeyed has not been read out of existence; Rule 37(b)(2) has never
13 been read to authorize sanctions for more general discovery abuse."). Here, even assuming that
14 Caltrans violated the May 3 order, that order is not the sort recognized under Rule 37(b)(2)'s
15 sanctioning provision. Nevertheless, plaintiffs are correct in spirit: A party cannot disobey
16 a court order with impunity. Civil contempt sanctions are available against a party that has
17 disobeyed "a specific and definite court order by failure to take all reasonable steps within the
18 party's power to comply." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d
19 693, 695 (9th Cir. 1993). A party seeking a finding of civil contempt against an opposing party
20 must demonstrate "(1) that [the opposing party] violated the court order, (2) beyond substantial
21 compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear
22 and convincing evidence." *Ibid*. Even assuming Caltrans violated the May 3 order, plaintiffs
23 have failed to establish by clear and convincing evidence that this violation was not based on a
24 good faith and reasonable interpretation of the order. Plaintiffs' motion for sanctions is therefore
25 **DENIED**.

**CONCLUSION**

27 Based on review of the administrative record and as per the foregoing analysis, this
28 action is **REMANDED** to prepare a revised EA and record in accordance with the instructions

above. Other than this, both motions for summary judgment are **DENIED** without prejudice to a new round of litigation once the next administrative action is taken.

**IT IS SO ORDERED.**

Dated: April 4, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE